

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **REXAM BEVERAGE CAN COMPANY,** a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 06 C 2234 |
| v. | ) ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **DAVID F. BOLGER as TRUSTEE of THE DAVID F. BOLGER REVOCABLE TRUST**, a Florida resident, and **CITY OF FAYETTE, IOWA**, an Iowa municipal corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rexam Beverage Can Company ("Rexam"), entered into a triple-net lease in

1966 for a property in Loves Park, Illinois, that ultimately came to be owned by Defendants,

David F. Bolger, the David F. Bolger Revocable Trust, and the City of Fayette, Iowa

(collectively, "Bolger"). The lease provided for an initial term of twenty-five years, which

Rexam could extend in five-year increments provided that it gave Bolger at least 180 days'

notice. When Bolger refused to accept Rexam's notice of renewal of the lease in late 2005 and

early 2006, Rexam instituted a declaratory judgment action in Illinois state court and remained in

possession of the premises after the lease's termination date of March 31, 2006. Bolger removed

the case to this Court on the basis of diversity of citizenship and asserted counterclaims under the

lease and under the Illinois holdover tenancy statute, 735 ILCS 5/9-202.

After all of the parties consented to have this Court decide any and all matters in the case pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(a), Bolger moved for partial summary judgment. On July 24, 2007, the Court granted Bolger's motion, finding that Rexam's notice of renewal was untimely and that Rexam's holdover tenancy was "willful" for the purposes of the holdover tenancy statute, entitling Bolger to double the fair market rental value of the property for the period of Rexam's willful holdover tenancy. Because the issue of damages was not part of the motion and because Rexam was still in possession of the property, the Court did not address the amount of damages in its July 24, 2007, ruling. On January 18, 2008, the Court decided Bolger's motion to set a termination date for Rexam's willful holdover tenancy, which the Court treated as a motion for partial summary judgment. The Court found that Rexam tendered possession of the premises and ended its holdover tenancy on August 31, 2007. In a separate ruling on January 22, 2008, the Court denied Rexam's motion to amend its July 24, 2007, summary judgment ruling.

After the Court's January 2008 rulings, several issues remained for trial, including the market rental value of the premises and Rexam's liability, if any, for damage to the property and other alleged violations of the terms of the lease. In addition, Rexam, while acknowledging that the Court had ruled on the issues of willfulness and the duration of the holdover period, asserted that its occupation of the premises ceased to be willful at some point due to Bolger's demands that Rexam remain in possession of the premises in order to complete repairs to the property. This Court held a bench trial on the remaining issues from June 23 through June 27, 2008. This decision constitutes the Court's findings of fact and conclusions of law.

## I.    The Willfulness of Rexam's Holdover Tenancy

As discussed above, the Court has already held that Rexam was a willful holdover tenant for the purposes of the Illinois penalty statute when Rexam retained possession of the premises after March 31, 2006, without a colorably justifiable reason. *See* Memorandum Opinion and Order of July 24, 2007, at 16. Rexam failed to give Bolger notice of its intent to renew the lease in a timely fashion and was aware of Bolger's rejection of the attempted renewal well before the expiry of the lease period. *Id.* at 16-17. Nonetheless, Rexam retained possession of the premises for approximately seventeen months until it tendered possession of the premises to Bolger on August 31, 2007. *See* Memorandum Opinion and Order of January 18, 2008, at 8-9. The fact that Rexam was a willful holdover tenant as of April 1, 2006, and the duration of the holdover tenancy are no longer at issue. The only issue that remains for decision is whether, as Rexam contends, its holdover tenancy ceased to be "willful" at some point prior to August 31, 2007. The Court finds that it did not.

As it did in deciding the initial willfulness issue in July 2007, the Court finds that the relevant legal standard for willfulness under the Illinois holdover tenancy statute is set forth in *J.M. Beals Enters., Inc. v. Indus. Hard Chrome, Ltd.*, 271 Ill. App. 3d 257, 648 N.E.2d 249 (1995). The *Beals* court held that a holdover tenancy will be considered willful when the tenant knows that its continued occupation of the premises is wrongful. *Id.* at 261, 648 N.E.2d at 252. On the other hand, "where a tenant remains in possession for colorably justifiable reasons, he should not be charged under the statute." *Id.* at 261, 648 N.E.2d at 252. The Court has already found that Rexam did not have a colorably justifiable reason for retaining possession when the lease expired on March 31, 2006. The question that remains to be answered is whether Rexam

had a colorably justifiable reason for retaining possession at any point prior to tendering possession to Bolger on August 31, 2007.

Rexam's argument appears to be that its initially willful occupation ceased to be willful at some point as a result of Bolger's demands that certain repairs be completed and Bolger's refusal to take possession of the property. The evidence at trial showed that Bolger did insist that Rexam complete repairs to the leased premises. (Rexam Ex. 2, 3; Tr. 761:1-8, 765:1-9.) At times, Bolger's communications with Rexam and its agents were confusing, even contradictory, as when he appeared to acknowledge that some repairs could only be completed "weather permitting" while still maintaining that Rexam was required to vacate the premises by March 31, 2006. (Rexam Ex. 3.) The Court notes, however, that Bolger never accepted Rexam's attempted rent payments at any point during the holdover period. (Tr. 765:8-9.)

The Court has twice rejected arguments by Rexam that Bolger waived its claim to treat Rexam as a holdover tenant by seeking to enforce the terms of the lease. *See* Memorandum Opinion and Order of July 24, 2007, at 8-15; Memorandum Opinion and Order of January 22, 2008, at 8-9. Rexam appears to invoke these facts now in order to argue that its continued possession of the property was somehow less willful because Rexam was acting "to try to appease [Mr. Bolger]." (Tr. 767:10-17.) The Court rejects this argument. Bolger was entitled to demand repairs to the property in order to fulfill the lease's terms, and he was also entitled to demand that the premises be vacated on time as provided for in the lease. The fact that it may have been difficult for Rexam to achieve both things does not furnish a "colorably justifiable" reason for its occupancy of the premises beyond the termination date of the lease. Rexam chose to accede to some of Bolger's demands for repairs even though Bolger pointedly insisted that

- 4 -

Rexam had no right to continue occupying the property. Rexam is a sophisticated business entity operating in an arm's-length context; had it chosen to disobey Bolger's commands, it could have done so.

Rexam's own evidence and pleadings illustrate why Rexam was willing to "appease" Mr. Bolger even though his demands put Rexam in a "Catch-22" whereby it had to violate some terms of the lease in order to comply with others: Rexam calculated that staying on and making the repairs would allow it to negotiate a new lease for the premises. Rexam's agent, Brian Clancy, testified that in February 2006, before the lease expired but after Rexam had learned that Bolger was rejecting its untimely notice of renewal, he "always felt that [the parties] would make a deal eventually" to renew the lease. (Tr. 759:12-19.) He later testified that Rexam decided to stay on and make repairs in order to "appease" Mr. Bolger "and also possibly to try to get new lease terms in the building." (Tr. 767:16-17.) This evidence shows that Rexam knew that it was wrongfully overstaying the lease, with no agreement in place, in order to complete repairs and hopefully reach a new agreement for an extension. The conscious and calculated nature of this decision is highlighted by the statement—which appears overtly in both Clancy's testimony and Rexam's briefs—that Rexam would have chosen a different course of action had Rexam known that Bolger would pursue double rent as a penalty pursuant to Illinois law. (Tr. 806:10-18; Rexam's Post-Trial Br. at 6.) Rexam admits that the decision to overstay the lease while making the repairs Bolger was demanding was the result of a "calculus" that would have been different had Rexam realized the potential consequences. (Rexam's Post-Trial Br. at 6.) In other words, Rexam made a conscious decision to overstay the lease because it thought the penalty would not be severe. This, of course, is practically the definition of willfulness.

Furthermore, the evidence at trial showed that the duration of the holdover tenancy was a direct product of conscious choices made by Rexam and was not dictated by Bolger's demands for repairs or refusals to take possession of the property. The Court has already determined that Rexam's holdover tenancy ended on August 31, 2007, when Rexam declared that it was surrendering the premises and made the key available to Bolger, even though Bolger rejected this tender of possession. Memorandum Opinion and Order of January 18, 2008, at 8. The record illustrates a laundry list of reasons why Rexam needed to stay in possession of the premises between March 31, 2006, and August 31, 2007: it had a subtenant that was occupying the facility (Tr. 715:8-21, 761:16-20, 777:9-11.); it had failed to secure a replacement facility and therefore needed time to find one and execute a lease (Tr. 761:16-20.); it needed time to clean the facility and move its equipment out (Tr. 732:7-733:2.); and it needed time to complete repairs that could only take place after the facility was empty. (Tr. 778:24-779:14.) The process of moving Rexam's equipment out of the facility was hampered by weather conditions and was not complete until April 2007, according to Rexam's timeline. (Rexam's Post-Trial Br. at 7.) Because many of the repairs had to be made when the building was empty, Rexam could not begin making the repairs that Rexam's president, Frank Brown, acknowledged to be "required under the Lease" until more than a year after the lease expired. (Bolger Ex. 26.) The repairs were not complete until Envision Environmental finished its building decommissioning activities on August 30, 2007—one day before Rexam tendered possession, ending its holdover tenancy. (Bolger Ex. 182.)

To summarize, the Court finds that Rexam cannot use Mr. Bolger's demands for repairs or his refusals to take possession of the property to efface the obvious willfulness of its conduct.

Mr. Bolger and his demands did not somehow overpower Rexam's will and force it to make the choices it did. The evidence at trial showed that the length of Rexam's holdover tenancy was caused by the time-consuming process of finding a new facility, moving its equipment, and completing repairs. This quandary might have been avoided had Rexam taken action sooner to evacuate the premises. Instead, Rexam continued to occupy the premises in bad faith, knowing that its notice of renewal was untimely, because it calculated that it would be forgiven for doing so when it reached a new lease agreement with Bolger. If it did not reach a new agreement, Rexam believed that the penalty would not be severe. Rexam misjudged Bolger's willingness to enter a new agreement and miscalculated the amount of damages Bolger might seek under the Illinois penalty statute. Realizing its mistake, Rexam did the best it could under the circumstances to clear out and make the repairs it recognized as required by the lease. The day after these repairs were completed, Rexam tendered possession of the property notwithstanding Bolger's refusal to accept this tender.

Rexam may have been greatly inconvenienced by the logistics of emptying and repairing the premises, but this was a bind of its own conscious making. None of Rexam's evidence or arguments alters the conclusion that its initial decision to wrongfully overstay its lease was a willful choice that caused Rexam to occupy the premises until it tendered possession to Bolger on August 31, 2007. Therefore, the entire holdover tenancy was "willful," and Bolger is entitled to statutory damages equal to double the fair-market rental value of the premises under 735 ILCS 5/9-202.

- 7 -

## II. The Market Value of the Premises

Because Rexam was a willful holdover tenant, Bolger is entitled to "double the yearly value" of the property from April 1, 2006, through August 31, 2007. 735 ILCS 5/9-202. In order to prove the value of the property, Bolger presented the testimony of Chris Hall, the president of the appraisal division of an international real estate company. (Tr. 282:5-10.) Hall testified that he had twenty-two years of commercial real estate appraisal experience and that his specialty was industrial and commercial real estate. (Tr. 283-287.) Based on this testimony, the Court found that Hall was qualified as an expert in appraising commercial and industrial real estate.

Hall testified that he performed an appraisal of the property at issue in this case. Hall's methodology included an inspection of the building, research into the conditions of the real estate market in Loves Park/Rockford and surrounding areas, and the selection of "comparable" properties in the relevant geographical area. (Tr. 291-295.) Hall testified that the factors he considered in selecting comparable properties included age, ceiling heights, location, and lease conditions that might affect the properties' market appeal. (Tr. 295:4-8; 297:18-24.) Based on his analysis of the property at issue in this case and comparable properties in the relevant market, Hall testified that the yearly gross rental value of the property was $4.38 per square foot, or $443,895.47, yielding a monthly rate of $36,991.29. (Tr. 302:2-16) Bolger argues that it is entitled to double this rate for each of the seventeen months that Rexam held over, resulting in a total of $1,257,703.83 in damages under 735 ILCS 5/9-202. (Bolger's Post-Trial Br., Ex. A.)

Rexam alleges that Hall's methodology was flawed and that the actual value of the premises was much less: "$1.35 per square foot, but not more than $2.00 per square foot." (Rexam's Post-Trial Br. at 2.) In addition to being imprecise, Rexam's position on the

appropriate market value lacks a convincing foundation in fact. Rexam argues that "the most reliable evidence is from a consummated transaction," (Rexam's Post-Trial Br. at 2.) which would certainly be true if the transaction in question involved the same property. Instead, Rexam asks the Court to accept the rental rate it obtained for a different property as evidence of the value of the Bolger property. Rexam's evidence showed that it was able to lease a total of 87,000 square feet of space in a different facility at a blended gross rental rate of $2.60 per square foot. (Tr. 773:9-776:4.) Because Rexam believes that a net lease rate is the appropriate measure of damages, Rexam argues that the Court should subtract $1.25 per square foot to account for the taxes, utilities, and insurance typically covered by the tenant under a net lease, yielding a total of $1.35 per square foot.

The Court finds this argument unpersuasive. The underlying problem with all of Rexam's evidence regarding the rental value of the property is the question of comparability. Rexam seems to assume that, because Rexam found the new property to be suitable as a replacement, the new property was "comparable" for all purposes. But the "market" that determines market value is the aggregate of all potential tenants interacting with all potential suppliers of rental space, not Rexam alone. Rexam's needs and goals could be atypical, causing it value the property differently than most companies. Furthermore, despite Mr. Clancy's testimony that the new building was "better" than the old one (Tr. 776:5-20.), the specific location, size, and other attributes of the replacement facility could have affected its relative value in ways that are not clear.

The issue of comparability—of the facilities, of locations, of time, and of lease terms—is one that requires the type of expert testimony that Rexam declined to provide in this case. In lieu

of expert testimony, Rexam attacks the methodology used by Bolger's expert, arguing that he failed to account for certain factors that would affect the selection of comparable properties and ultimately the market value of the property at issue. (Rexam's Post-Trial Br. at 4.) But here, again, Rexam has nothing but naked assertions and some testimony by its non-expert real estate agent, Mr. Clancy, to support its argument that Hall's methodology was unreliable. Nor is the Court persuaded by evidence that a different appraiser, Mr. Swoboda, provided Bolger with a lower estimate of the facility's rental value in 2006. (Tr. 631:6-633:25.) Because Mr. Swoboda did not testify or otherwise present any type of report, the Court has no information about Mr. Swoboda's background or how he came to his conclusions. In light of Hall's qualifications, the apparent reasonableness of his approach, and the lack of any persuasive evidence to contradict his valuation, the Court credits Hall's testimony that the annualized rental value of the property was $442,895.47. However, because the rate provided by Hall is a gross rate, Rexam is entitled to a set-off in an amount equal to any taxes, utilities, and insurance premiums that it paid during the holdover tenancy period, which would be covered by the landlord under a gross lease agreement. The Court addresses this issue in Section VII below.


## III.    Rexam's Liability for Damage to the Property

Bolger claims that Rexam is liable for damage to the property, including the cost of replacing the roof. The relevant portion of the lease, Article 5(c), provides that:

> Lessor shall have no obligation with respect to the maintenance
> and repair of the Premises or any buildings or improvements which
> may be erected or made thereon. Lessee shall be solely responsible
> for the maintenance of such buildings and Premises and for
> keeping all of the same in good condition, order and repair,

including all structural and extraordinary changes that may be
required, reasonable use and ordinary wear and tear excepted.

(Rexam Ex. 1.) In order to prevail on its claim, Bolger must prove the extent of Rexam's duty to

maintain and repair the premises, and then prove that there was damage that fell within the scope

of that duty.


A.    The Extent of Rexam's Duty

Rexam argues that under the lease it was responsible only for general maintenance and

upkeep of the property and not for major repairs or replacements of structural components.

Rexam is correct that, as a general principle, "[a] general covenant to repair merely binds [the

lessee] to make ordinary repairs, and does not require him to make radical changes of a

permanent, substantial or unusual character," and that such a covenant "implies preservation of

the status quo and does not mean replacement." *Bogan v. Postlewait*, 130 Ill. App. 2d 729, 731,

265 N.E.2d 195, 197 (1970). Of course, the language of the lease is the ultimate source of the

parties' rights and obligations: if the parties to a lease wish to shift the burden of major structural

replacements and repairs from landlord to tenant, this intention should be "plainly discoverable in

the lease." *Sandelman v. Buckeye Realty, Inc.*, 216 Ill. App. 3d 226, 230, 576 N.E.2d 1038, 1040

(1991). In this case, the Court finds that such an intent is clearly expressed in the language of

Article 5(c).

Several factors convince the Court that the lease required Rexam to make extraordinary

repairs, including structural repairs and replacements. The first sentence of Article 5(c) states

that "Lessor shall have *no obligation* with respect to the maintenance and repair of the Premises

- 11 -

or any buildings or improvements which may be erected or made thereon." (Rexam Ex. 1 (emphasis added).) The plain import of this language is that the landlord disclaims any responsibility for repairing or maintaining the property for the duration of the lease; the logical implication of this disclaimer is that all maintenance and repairs must be performed by the tenant. This interpretation is strengthened by the next sentence of Article 5(c), which begins: "Lessee shall be *solely responsible* for the maintenance of such buildings and Premises . . . ." (Rexam Ex. 1 (emphasis added).) These clauses clearly indicate that either the tenant will perform major structural replacements and repairs, or no one will. Given that the landlord expected to receive the property back at the end of the lease, it is not reasonable to interpret the lease in a way that would allow the premises to collapse into rubble because no one had a duty to perform major repairs. The final factor that convinces the Court that Rexam was responsible for major structural replacements and repairs is the second half of the sentence quoted above, which explains that Rexam's responsibility for maintenance of the premises "includ[es] all structural and extraordinary changes that may be required." (Rexam Ex. 1.) Taken in conjunction with the language providing that Bolger has no responsibility for maintenance or repairs and that Rexam is solely responsible, the reference to "structural and extraordinary changes" makes clear that Rexam must make *all* necessary repairs, including those that would be considered structural and extraordinary.

Rexam raises several arguments in an attempt to avoid this conclusion. First, Rexam argues that Article 5(c)'s use of the phrase "all structural and extraordinary changes that may be required" is merely a reference to the fact that Rexam, as a long-term tenant, was allowed to make "structural and other alterations or additions" to the premises. In this context, according to

- 12 -

Rexam, the phrase "including all structural and extraordinary changes that may be required" means simply that Rexam's general duty of maintenance and repair extends to the maintenance of any changes that Rexam might need to make during the course of the lease. In Rexam's reading of the clause, then, the word "required" means "required by Rexam." In support of this reading, Rexam points out that the clause uses the term "changes" and not the word "repairs," which is significant because "repairs" would be the simplest word choice had the drafters of the lease intended to impose a duty to fix serious structural defects. As Rexam notes, Illinois cases have treated "changes" or "alterations" as conceptually distinct from repairs, indicating a change in purpose, function, or appearance rather than maintenance of the status quo. *See Justine Realty Co. v. American Can Co.*, 119 Ill. App. 3d 582, 584-85, 456 N.E.2d 871, 873 (1983) (*quoting* Black's Law Dictionary 1276 (5th ed. 1979)). Finally, Rexam argues that Article 5(c)'s exception for "ordinary wear and tear" is inconsistent with a duty to replace structural elements that cease to function through wear and tear, undermining Bolger's interpretation of the lease.

The Court is not persuaded by Rexam's textual arguments. Rexam asks the Court to read Article 5(c)'s reference to "structural and extraordinary changes" to mean simply that Rexam must take care of any alterations it makes to the property. But this is to neglect the second half of the clause: "as may be required." The only sensible reading of "such structural and extraordinary changes as may be required" is that Rexam must maintain the property in good condition, including making structural and extraordinary changes that "may be required" in order to keep the property in acceptable condition. Otherwise, the "structural and extraordinary changes" clause is a non-sequitur in the midst of a sentence that otherwise describes the type of repairs that the lessee is required to make. The Court also rejects Rexam's argument that a duty to make

- 13 -

major structural repairs is inconsistent with Article 5(c)'s exception for "reasonable use and ordinary wear and tear." Taken as a whole, Article 5(c) means that Rexam is solely responsible for all maintenance and repairs necessary to keep the premises in good condition, including structural and extraordinary repairs or changes when they are necessary in order to put the facility into good condition. The exception for wear and tear simply means that, so long as the facility is above the baseline of "good condition," Rexam is not liable for ordinary wear and tear that may bring the condition of the facility below a perfect or pristine state.[1]

## B.    Specific Items of Damage

### 1.    The Roof

Bolger called Edward Carlson, a professional in the field of commercial and industrial roofing, to testify in support of its claim for damage to the facility's roof. (Tr. 385-408.) Carlson testified that he inspected the roof on November 28, 2007. (Tr. 387:17-22.) Carlson observed that on the largest section of the roof there were loose pieces of metal and exposed flashings that would allow rainwater to enter the roof. (Tr. 395:11-18.) He testified that, when walking across the roof, he could feel that it was soft or "spongy," a condition

---

[1] This conclusion is supported by the definitive discussion of the concept of "wear and tear" in this Circuit, which is found in the recently-decided case of *Rickher v. Home Depot, Inc.*, No. 07-2850, Slip. Op. at 10-12 (7th Cir. July 28, 2008). In *Rickher*, the Seventh Circuit defined wear and tear as the "expected, often gradual, depreciation of an item" that is regularly used and "not meant to be maintained in pristine condition," such as a tool. *Id.* The Seventh Circuit contrasted "wear and tear" with more serious "damage," quoting with approval an earlier case in which it held that "the extensive damage and poor condition of [a] roof, parking lot, and HVAC units did not constitute 'reasonable wear and tear.'" *Id.* (*quoting Kallman v. Radioshack Corp.*, 315 F.3d 731, 740 n.5 (7th Cir. 2002)). In other words, an item can have wear and tear and still be in good or acceptable condition.

caused by leaks allowing moisture into the roof, resulting in damage. (Tr. 397:2-12.) In order to test the roof's condition, Mr. Carlson took two test cuts from what he believed to be the driest parts of the roof and found that the insulation in these parts was "damp or moist." (Tr. 444:9-21.) Based on his observations, Mr. Carlson concluded that the roof was saturated with water and needed to be replaced. (Tr. 394:16-18; 398:3-7, 19-22; 399:6-12; 403:24-404:14.)

Mr. Carlson's conclusion was also supported by documents produced by Rexam. An April 10, 2007, report by one of Rexam's contractors stated that the contractor "observed . . . numerous roof leaks in the Manufacturing Building," and noted that "[t]he water on the floor had a slightly oily appearance." (Bolger Ex. 160.) The same contractor noted in May 2007 that "[i]t appears that the roof is very 'spongy' and is leaching an oily substance. Every time it rains, oily material is found on the floor . . . . According to AMJ Industries, the oily substance has been leaching from the roofing materials for some time." (Bolger Ex. 165.) Mr. Carlson testified that the leaching of an oily substance from the roof was a sign that the roofing materials had broken down, suggesting that the roof had been leaking for "more than three or four years." (Tr. 408:9-19.) Finally, John Myers, a roofing contractor hired by Rexam who performed repairs on the roof stated that in June 2007 he observed "probably 100" leaks in the warehouse roof. (Tr. 362:10-363:1) Mr. Myers also testified that the interior of the roof was "really wet" under its rubber membrane and that the insulation inside the roof was wet. (Tr. 359:11-13; 360:17-20.)

Rexam makes several arguments in support of its assertion that the roof did not require replacement. First, Rexam attacks Mr. Carlson's testimony. Rexam notes that Carlson took only two samples from the roof, implying that this was an insufficient sample size from which to draw conclusions about the condition of the roof as a whole. Rexam also points to Carlson's testimony

that he never observed water-saturated insulation on the main roof and that he did not use an

infrared detector to measure water saturation levels in the roof, though it was possible to do so.

Finally, Rexam argues that Carlson's testimony is biased because he was hired by Bolger to

provide an estimate of the cost to replace the roof and hoped to receive a contract to complete the

roof replacement.

The bias argument is difficult to understand: for one thing, Bolger no longer owns the

building, and the roof has already been replaced. Therefore, Carlson had no motivation at the

time of his testimony to curry favor with Bolger. Beyond this, the Court found Carlson's

testimony to be well-reasoned and unbiased. Carlson took only two samples, but he testified that

they were from the driest areas of the roof. It stands to reason that if they were moist, the

moisture level of the rest of the roof was at least as high if not higher. This is the reasoning that

Carlson applied, and it comports with common sense. Furthermore, the core samples were not

the only basis for Carlson's conclusion that the roof's interior was damp. Carlson's testimony,

corroborated by other evidence, was that the roof was palpably spongy, indicating the presence of

moisture inside the roof. Without any expert testimony proffered by Rexam to show that

Carlson's methodology was flawed, the Court credits Carlson's testimony and his conclusion that

the roof needed to be replaced. The same reasoning applies to Rexam's argument that Carlson

should have used an infrared detector, which is meaningless to the Court without any evidence

that such technology was necessary for an accurate assessment of the roof's condition.

Rexam's other evidence purporting to show that the roof did not require replacement is

similarly unpersuasive. Rexam notes that Carlson testified that it was still "possible" to repair

and maintain the roof. (Tr. 435:23-436:2.) But the fact that it was theoretically possible does not

mean that it was efficient or reasonable to do so; indeed, Carlson indicated that it was not cost-efficient in his testimony. (Tr. 436:11-15; 438:12-17.) Rexam also points to testimony by Dick Drewek, a contractor who oversaw repairs to the facility, that the roof had "a few leaks" and "nothing close to" 100 leaks, as well as Brian Clancy's testimony that the roof was in "good condition." (Tr. 697:24-698:16, 779:23-780:11.) Unlike Carlson, neither Clancy nor Drewek is an expert on roofs. Furthermore, their testimony is vague: it is unclear how many leaks is "a few," how many leaks is "nothing close to 100," and what is "good condition." Nor is the Court persuaded by the fact that John Myers, the source of the "100 leaks" testimony, never told Rexam that the roof needed to be replaced. (Tr. 359:6-9.) The evidence, including Myers's testimony and a letter from the contractor Mark Roman, shows that Rexam had already decided in May 2007 that the roof would only be repaired, not replaced. (Tr. 344:19-22; Bolger Ex. 165.) Therefore, there was no reason for Myers or Roman to discuss replacement. In fact, Myers testified that he told Drewek, "Boy, this roof is really wet underneath the rubber membrane" but that "it" was "not [Drewek's] call." (Tr. 359:11-16.) Taken in context, this testimony indicates that Myers believed the roof needed to be replaced because of its poor condition but understood that Drewek did not have authority to change Rexam's decision to repair it.

To summarize, the Court finds that a preponderance of the evidence, including the expert testimony of Mr. Carlson and statements about the condition of the roof by Rexam's own contractors, indicates that the roof was in serious disrepair and needed to be replaced. Based on Carlson's testimony that the presence of an oily residue in the liquid seeping from the roof indicates years of deterioration (Tr. 408:9-19.), the Court concludes that the roof needed to be replaced at the time that Rexam's lease expired on March 31, 2006. The Court also accepts

- 17 -

Mr. Carlson's estimate of $405,470 as the cost of replacing the necessary areas of the roof.
(Tr. 391-399, as summarized in Bolger's Post-Trial Br., Ex. A.)

### 2. The Rail Spur

Bolger claims that Rexam is liable for damages to the rail spur that connects the property
to the main Union Pacific rail line because Rexam allowed the tracks to fall into disrepair. The
lease itself does not address the rail spur. The record shows that Bolger's predecessors financed
the construction of the rail spur, while it was Rexam's predecessor, National Can, that contracted
with Union Pacific's predecessor to establish rail service to the property. (Rexam Ex. 65;
Tr. 157:3-7.) The Court concludes that Rexam had no duty to maintain rail service for Bolger's
benefit because the lease is silent on the issue, while the contract establishing rail service was
personal to Rexam's predecessor and did not provide for assignment of any interest to third
parties. (Rexam Ex. 65.) But even if Rexam had a duty to maintain the rail spur, Bolger's
damages claim would still fail. Bolger's expert, Benedetto Guido, testified unequivocally that
restoration of rail service would require replacing the current seventy-two-pound rails with
112-pound rails in order to comply with a new technical standard imposed by Union Pacific on
its customers. (Tr. 216-223, 227:5-228:8.) Because the tracks would need to be rebuilt in order
to restore service, it was not Rexam's failure to maintain but rather the railroad's requirement of
heavier rails that rendered the rail spur unusable. Therefore, Bolger cannot show any damage
resulting from Rexam's failure to maintain the rail spur.

Bolger argues that this case is similar to *Hollywood Bldg. Corp. v. Greenview Amusement
Co.*, 315 Ill. App. 658, 43 N.E.2d 566 (1940), which held that a tenant was required to make

- 18 -

structural changes to the leased premises in order to bring them into compliance with a city ordinance. The Court disagrees. In *Hollywood*, the basis of the tenant's liability was a clause in the lease requiring the tenant to comply with "all health and police regulations." 315 Ill. App. at 661, 43 N.E.2d at 567. After the lease was executed, the street in front of the building was widened and the sidewalk was narrowed, causing the building's canopy to extend over the street in violation of a Chicago municipal ordinance. 315 Ill. App. at 660, 43 N.E.2d at 567. The instant case differs significantly because Bolger seeks to force Rexam to adhere to conditions that are not contained in a statute or building code, but rather are imposed pursuant to contract by Union Pacific, a private entity. While sound policy dictates that leased premises should be maintained in compliance with publicly-enacted safety regulations, the same rationale does not extend to contractual conditions imposed by private third parties. Furthermore, in the *Hollywood* case there was a clause in the lease that provided a foothold for the tenant's duty to remodel the premises. In this case, as discussed above, the lease contains no provision requiring the maintenance of rail service or the rail spur. Finally, as discussed above, the rail spur would be unusable whether or not it was properly maintained. Consequently, Bolger's claim for damage to the rail spur must be denied.


### 3. Damage Resulting from Broken Pipes

Although Rexam tendered possession of the property to Bolger on August 31, 2007, Bolger claims that Rexam is liable for damages that occurred when one or more pipes froze on January 23, 2008, almost five months after possession was transferred. The basis for this claim is Bolger's assertion that the pipe freeze occurred because Rexam removed parts from some of

the building's heaters prior to surrendering the premises. However, Bolger's own agent, Gerald Norton, visited the facility repeatedly after Rexam surrendered the premises and testified that the gas was never turned off and that the heat was working properly at least until the time that the building was sold. (Tr. 488-491.) This testimony undermines the claim that Rexam somehow damaged or disabled the heaters. Bolger's claim is also undermined by the report of the contractor Bolger hired in the aftermath of the pipe-freezing incident. The report indicates a myriad of problems with the building's heaters, including gas knobs, burner switches, and circuit breakers that were turned off and belts that were broken. (Bolger Ex. 125.) Logic dictates that the knobs, switches, and circuit breakers could not have been turned off when Rexam left the facility because the heaters were working after that point, according to Mr. Norton. The only hint of evidence to support Bolger's theory that Rexam "cannabilized" the heaters (98:15-18.) is a statement in the contractor's report that one of the ten units was missing a blower wheel and electronic components. (Bolger Ex. 125.) Bolger has no evidence to show that Rexam was responsible for the missing parts or that the missing parts from that particular unit caused the apparently catastrophic heating breakdown. Indeed, this would be a difficult showing to make, as the unit with the missing parts was only one of eight units that were not working when inspected by the contractor. (Bolger Ex. 125.) In light of the paucity of evidence to establish Rexam's responsibility for the heating breakdown, Bolger's claim for damages arising out of the January 23, 2008, pipe freezing incident must be denied.

### 4. Dock Levelers

The Court finds that there is no genuine issue as to Rexam's liability for damage to the facility's dock levelers. Rexam admits that "some repairs beyond ordinary wear and tear [were] necessary" and that six dock levelers needed to be repaired and five needed to be replaced. (Rexam Ex. 71.) While Rexam offered Bolger $18,460 for the dock levelers, the estimate obtained by Rexam's agent, Brian Clancy, comes to $20,306.00 once the general contractor's markup is included. (Rexam Ex. 70.) Therefore, the Court finds that $20,306.00 is the appropriate amount of damages for repairing and replacing the dock levelers.

### 5. Bradley Sink

Bolger claims that it is entitled to damages for a Bradley sink that was not functioning at the time Rexam surrendered the premises. A Bradley sink is a special sink with a large round basin and a round, hula-hoop-like spigot that allows multiple workers to wash their hands at once. (Tr. 787:5-11.) The evidence on the condition of the Bradley sink is conflicting. Mr. Norton testified that one of the building's two Bradley sinks was not operational when he visited the facility. (Tr. 529:2-3.) However, Rexam's agent, Mr. Clancy, testified credibly that he hired a Mr. Hrnciar to put the Bradley sink back into working order, an assertion that is supported by cancelled checks that are in evidence. (Tr. 787:15-788:3, 808:18-809:23; Rexam Ex. 75.) Mr. Clancy specifically recalled that Hrnciar was able to repair the sink because he found a special part that he needed—a circular pipe that discharges water—at a local plumbing service company. (Tr. 787:23-788:3.) The specificity of his recollection enhances the credibility

of his testimony. The Court finds based on a preponderance of the evidence that both Bradley

sinks were working. Therefore, Bolger's claim for repairs to the Bradley sink is denied.

### C. The Proper Measure of Damages

The Court has found that Rexam had a legal duty to replace the facility's roof and to

repair and replace the facility's dock levelers. Bolger claims that it is entitled to damages in an

amount equal to the estimated costs of repairing and replacing these items. Rexam argues that

Bolger is not entitled to recover the full estimated cost because Bolger sold the property without

making the repairs and cannot prove the extent to which the sale price of the property was

affected by the damaged roof and dock levelers. The Court finds that the estimated cost of the

repairs is the proper measure of damages.

Rexam is correct that Bolger can only recover "actual losses arising from the breach,"

*First Nat'l Bank of Des Plaines v. Shape Magnetronics, Inc.*, 135 Ill. App. 3d 288, 292, 481

N.E.2d 953, 956 (1985) (internal quotes omitted), and that "the overriding rule of restitution

remains that the injured party . . . not receive a windfall." *West Ontario Bldg. Corp. v. Palmer

Truck Leasing Co.*, 22 Ill. App. 3d 467, 478, 317 N.E.2d 740, 749 (1974). However, the cost of

repairs is generally a valid measure of the damage a landlord suffers when a lessee fails to repair

or maintain property. *See Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.*,

259 Ill. App. 3d 836, 860-62, 635 N.E.2d 485, 501-02 (1994). In *Ceres*, the Illinois Appellate

Court indicated that damages should be measured by the decrease in the market value of the

property only when the cost to repair the property is greater than the value the landlord lost as a

result of the lessee's non-performance. *Id.* at 860-62, 635 N.E.2d 485, 501-02. In other words,

the diminution in market value serves as an upper limit on the landlord's damages in order to prevent a windfall situation in which the landlord is compensated for the cost of repairs that ultimately will add no value to the property.

This is not a case, however, where the landlord's claim for repairs is disproportionate to the change in the market value of the property caused by its damaged condition. Rexam argues that awarding Bolger the cost of repair will result in a windfall because Bolger did not actually incur the cost of repairs and did not offer evidence that the ultimate buyer of the property took specific items of damage into account in making an offer or negotiating a price. Furthermore, Rexam argues, Bolger sold the property for only $230,000 below its asking price, but is asking for much more than that as compensation for damage to the property. But this evidence has no probative value: it is possible, in fact likely, that Bolger had to reduce its asking price in light of the seriously damaged condition of the property. Therefore, the asking price cannot be used as a starting point for measuring the decreased value of the property. It is also reasonable to infer that any purchaser would discount its offer in light of the anticipated costs of repairing the damage Bolger seeks to recover for here, particularly the roof, which is a necessity under any conceivable use of the facility. Therefore, it cannot be said that the cost to repair exceeds the decrease in market value of the facility; rather, the estimated cost of repair is the only reasonable proxy the Court has for determining the decreased market value of the property in its damaged condition. In other words, the property was diminished in value by the amount needed to repair it, whether or not it was actually repaired by Bolger.

Rexam also argues that Bolger has failed to prove that specific items of damage led to specific decreases in the purchase price. Rexam relies on the Illinois Appellate Court's opinion

in *West Ontario* as support for this alleged requirement of specificity. Closer attention to the issues in *West Ontario* reveals this reliance to be misplaced. The *West Ontario* court denied the landlord's claim for damages because, "[a]ssuming that the purchaser reduced the purchase price by the amount it would have to expend to rehabilitate the premises," the landlord had no evidence that "the specific element of damages caused by the subtenants was specifically quantified in repair bills." 22 Ill. App. 3d at 478, 317 N.E.2d at 748. The distinction the court drew was between the overall damage to the property—which the court was willing to assume was reflected in the price offered for the building—and the damage caused specifically by the defendants. The rule in *West Ontario* is simple: a landlord cannot recover from a subtenant for all damages to a building, regardless of whether specific damages were actually caused by the defendant. The issue of specificity, in other words, relates to the identity of the party who caused the damages. Here, there is no question that Rexam was responsible for all compensable items of damage. This Court, like the *West Ontario* court, "assum[es] that the purchaser reduced the purchase price by the amount it would have to expend to rehabilitate the premises." 22 Ill. App. 3d at 478, 317 N.E.2d at 748. Therefore, under Illinois law, Bolger is entitled to recover the estimated cost of making the necessary repairs. As discussed above, the Court finds that these amounts are $20,306 for the dock levelers and $405,470 for the roof.


IV.    **Brokerage Fees**

Bolger claims an entitlement to brokerage fees arising out of its sale of the property under Article 10(b) of the lease. However, Article 10(b) by its terms applies only to brokerage commissions incurred in re-letting the premises in the event of Rexam's default during the term

of the lease. (Rexam Ex. 1.) Here, Rexam did not default during the term of the lease, and any

fees Bolger incurred in selling the property were the same as those it would have incurred had

Rexam not overstayed the term of the lease. Therefore, Article 10(b)'s provision for brokerage

commissions is inapplicable and Bolger is not entitled to brokerage fees.


## V.    Prejudgment Interest

Bolger argues that it is entitled to prejudgment interest on Rexam's rent payments for the

period of Rexam's holdover tenancy.[2]   Prejudgment interest is a substantive issue that is

governed by state law in cases, like this one, where state law provides the rule of decision. *See*

*Perlman v. Zell*, 185 F.3d 850, 857 (7th Cir. 1999) ("Prejudgment interest depends on the law

that supplies the substantive rule of decision.") Under Illinois law, "[p]rejudgment interest is not

recoverable absent a statute or agreement of the parties providing for it." *A.O. Smith Corp. v.*

*Kaufman Grain Co.*, 231 Ill. App. 3d 390, 399, 596 N.E.2d 1156, 1163 (1992). 815 ILCS 205/2

provides for prejudgment interest in cases involving breach of contract, but only when the

damages are "fixed or easily computed" prior to judgment. *Medcom Holding Co. v. Baxter*

*Travenol Laboratories, Inc.*, 200 F.3d 518, 519 (7th Cir. 1999). In this case, the fair market

rental value of the property was not determined until after a trial and had to be established by

expert testimony and appraisals; it was clearly not "fixed or easily ascertained." Furthermore,

Bolger seeks to recover under the holdover statute, not under the contract per se. Therefore, the

Court finds that prejudgment interest is not available under 815 ILCS 205/2.

---

[2]  Bolger also requests prejudgment interest on repairs and credits given as a result of the
January 2008 pipe freezing incident, but the Court need not address this issue as it has already
found that Bolger is not entitled to these damages.

The remaining possible basis for prejudgment interest is the lease between the parties. The lease itself does not address prejudgment interest. However, the Seventh Circuit has interpreted Illinois law to allow for prejudgment interest at a market rate in cases where an indemnification clause between the parties indicates an intent to "[do] everything possible to mandate complete compensation" even though the contract does not specifically provide for prejudgment interest. *Medcom*, 200 F.3d at 520. Article 9(a) of the lease in this case contains such a comprehensive indemnification clause. (Rexam Ex. 1.) However, Bolger is already being completely compensated—and then some—by the application of the double-rent provision of 735 ILCS 5/9-202, which the Illinois legislature intended to be the exclusive remedy for willful holdovers. *See Burrows v. Schulman*, 19 Ill. App. 2d 459, 460, 154 N.E.2d 327, 328 (1958). Because the doubling of the fair-market rental value of the property increased Bolger's recovery by much more than the application of a market interest rate, prejudgment interest is not necessary in order to achieve the goal of "complete compensation" that provided the basis for the Seventh Circuit's decision in *Medcom*. Therefore, Bolger's claim for prejudgment interest is denied.

## VI. Attorneys' Fees and Costs

At the final pre-trial conference, the Court instructed the parties that it would not consider the issue of attorneys' fees and costs until the merits of the underlying case had been decided. Therefore, the Court makes no decision as to Bolger's entitlement to attorneys' fees and costs at this time. The Court will set a briefing schedule for the issue of attorneys' fees at the next status hearing.

## VII. Set-off

Because the Court adopts Bolger's expert's estimate of the rental value of the property, which is a gross rate, Rexam is entitled to a set-off for taxes and utilities that it paid for during the holdover period, as these expenses are covered by the landlord under a gross lease. (*See* Tr. 298:25-299:9.) The Court rejects Bolger's argument that Rexam has failed to prove that it actually paid for these expenses during the holdover tenancy period: the bills and canceled checks were introduced into evidence as Rexam's Exibit 48 and are summarized as Exhibit B to Rexam's post-trial brief. The evidence shows that Rexam paid $30,111.97 in electrical bills; $328.71 in water bills; $70,885.08 in gas bills; and $145.83 to the Rock River Water Reclamation District. (Rexam's Post-Trial Br., Ex. B.) Rexam's claim for $84.00 paid to ADT, a security service, on May 9, 2007, is denied. The nature of this charge is not clear, and Rexam has produced no evidence or argument indicating that a landlord under a gross lease typically must provide security monitoring services. Therefore, the total amount of Rexam's set-off is $101,471.59.

## VIII. Conclusion

For the reasons set forth above, the Court finds by a preponderance of the evidence that Rexam is liable to Bolger under 735 ILCS 5/9-202 in the amount of $1,257,703.83 for its willful holdover tenancy from April 1, 2006 through August 31, 2007. The Court also finds that Rexam is liable to Bolger for $405,470.00 in damages to the roof of the Loves Park facility and $20,306.00 for damages to the dock levelers. Bolger is not entitled to any other damages or to prejudgment interest. Rexam is entitled to a set-off in the amount of $101,471.59 for utilities and

taxes paid during the holdover tenancy period. Therefore, judgment is entered for Bolger in the amount of $1,582,008.24. The parties shall appear for a status hearing to discuss a briefing schedule for the issue of attorneys' fees and costs on September 3, 2008, at 10 a.m.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: August 20, 2008.                    United States Magistrate Judge